**FOURTH DIVISION**
**DOYLE, P. J.,**
**ANDREWS and BOGGS, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received*** **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)**
**http://www.gaappeals.us/rules/**

**November 27, 2012**

# In the Court of Appeals of Georgia

A12A1341. IN THE INTEREST OF J. C. W. AND J. C. W.  BO-062
CHILDREN.

BOGGS, Judge.

In the third appearance of these parties before this court,[1] three-year-old twins,

J. C. W. and J. C. W., appeal from a juvenile court order awarding long-term custody

until their 18th birthday to their maternal aunt and uncle. The children assert that this

court should reverse the juvenile court because (1) it lacked jurisdiction; ; (2) it

wrongly concluded that the Juvenile Code establishes a preference for relative

placement; (3) it failed to find that termination of parental rights and adoption by the

foster parents was in the twins' best interest; (4) it failed to conduct a de novo

---

[1] See *In the Interest of J. C. W.*, 311 Ga. App. 894 (717 SE2d 512) (2011) (*J. C. W. I*); *In the Interest of J . C. W.*, 315 Ga. App. 566 (727 SE2d 127) (2012) (*J. C. W. II*), cert. denied, *Interest of J. C. W.*, 2012 Ga. LEXIS .

rehearing; (5) it erred by finding the existence of a conditional stipulation to nonreunification and placement; (6) it abused its discretion by ruling the foster mother's testimony inadmissible; and (7) it erroneously entered its order nunc pro tunc. For the reasons explained below, we vacate the juvenile court's order with direction.

## Juvenile Court Proceedings[2]

The record shows that twins were born on February 10, 2009, and their older brother Ja. C. W. was born on October 12, 2007. On March 21, 2009, the juvenile court entered an order authorizing shelter care for the three children based upon the risk of "inappropriate or no supervision." The following day, all three children were placed in the care of one foster family working with a private agency, Giving Children a Chance of Georgia ("GCAC"). At the time of the placement, the foster parents did not intend to adopt any children.

Less than a month later, the foster parents determined that caring for three young children was "too much" for them to handle. The twins required constant care and the older 17-month-old sibling "had some disciplinary issues." The foster mother

---

[2] Although this case has already appeared before this court on two previous occasions, the issues now before us require us to include additional facts. Where possible, we will quote from our previous opinions.

2

testified that after a meeting with the Department of Family and Children Services ("DFACS"), she believed all three children would be moved to another foster family. A few days later, however, she learned that DFACS had decided to leave the twins in her care and place the older sibling with another foster family. On April 13, 2009, the older sibling was placed in a different foster home based upon a determination by DFACS that "he needed individual attention to address his behaviors and perceived developmental delays."

On July 9, 2009, the juvenile court entered an order finding all three children deprived based upon the following: the mother's lack of adequate housing and income; the mother's mental health issues for which therapy and treatment had been recommended in April of 2009; the female twin's failure to thrive in the mother's care; a report that the female twin fell from the mother's lap resulting in visible physical injuries; and the mother's history with DFACS in another county with regard to the oldest child. The juvenile court also scheduled a permanency hearing to take place six months later on February 1, 2010. Throughout the remainder of 2009 and early 2010, the mother worked on her case plan and the permanency plan contemplated reunification with the mother. During this time, the mother did not

provide DFACS with complete information about relatives who might be available for placement of the children.

The record shows that in February 2010, the mother provided DFACS with the names of eight brothers for the first time. DFACS also changed the case plan to concurrent goals of reunification or placement with fit and willing relatives. Based upon an objection by the children's attorney, the juvenile court denied DFACS' request to change the permanency plan to include placement with a fit and willing relative in favor of "a concurrent plan of reunification and adoption."

Although the foster parents expressed an interest in adopting the twins by March 2010, they also suggested to DFACS three months later that friends who lived close to them might also want to adopt the twins. The friends, like the foster parents, did not wish to adopt the twins' older sibling.

On August 10, 2010, DFACS filed a petition in juvenile court to terminate parental rights as to all three children. On August 13, 2010, a meeting was held between the two sets of foster parents for all three children, a DFACS representative, and the mother's brother and his wife to discuss transitional visits with the aunt and uncle. Based upon information included in a court report prepared for a permanency review hearing held on September 23, 2010, friction developed between both sets of

4

foster parents and the aunt and uncle with regard to visitation.[3] In mid-October, all three children began visiting with their aunt and uncle, beginning with two-hour visits, progressing into an all-day visit, an overnight visit, and two or three weekend visits in a row.

On November 5, 2010, DFACS changed the placement of the twins' older brother from foster care to the aunt and uncle because their home had been approved for placement and transitional visits were going well. On November 15, 2010, the twins' foster parents moved to intervene in the pending juvenile court action and also requested that they be awarded custody following any termination of parental rights.

The next day, on November 16, 2010, DFACS filed a motion for non-reunification asserting that "further efforts to reunite the children with their parents would be detrimental in that there exists parental misconduct and inability relative to the [three] children within the meaning of OCGA § 15-11-94 (b) (4)." With regard to the mother, the motion alleged that she had failed to achieve the goals in her case

[3] The report notes that the uncle "felt the foster parents were disrespectful to him," "[t]herefore . . . [he] and his wife did not want to travel [to] the foster parents' home, nor have the foster parents in their home." The foster parents, on the other hand, were frustrated that the aunt and uncle did not make the first scheduled visit, and therefore did not make the children available for the second scheduled visit based upon their belief that the second visit "was contingent upon a successful [first] visit."

plan because she was without suitable housing, had not completed parenting classes, and did not have adequate financial resources to care for the children. The motion also stated that "[t]ermination of parental rights is not in the best interest of the children inasmuch as the permanency plan is placement with a fit and willing relative, to wit: [the] maternal uncle and aunt." DFACS also filed contemporaneously a motion to modify custody of the three children to the aunt and uncle.

The petition for termination of parental rights, the motion for nonreunification, and the motion to modify custody were all scheduled for a hearing on the same day, November 18, 2010.[4] At the beginning of the hearing, the mother's attorney waived notice and service of the motions for nonreunification and to modify custody. She also stated that the mother had "no objection to the motion for non-reunification" and would stipulate to the modification of custody to her brother and his wife. The trial court granted the motion for nonreunification and initially granted the motion to modify custody. When the children's counsel objected, the juvenile judge agreed to hear evidence before ruling on the motion to modify custody.

---

[4] DFACS' counsel did not dismiss its pending petition to terminate parental rights during the hearing, stating, "We'll make that determination once the [c]ourt has ruled on the motion for non-reunification and the petition to modify."

The children's attorney called two witnesses: the foster mother and the mother's brother. The foster mother testified that she was interested in adopting the twins, but was not interested in having their older brother back in her home. She explained that her desire to adopt the twins developed over time as she and her husband became "more attached to them and felt that it was the right thing to do." She believed that the children had been abandoned by their family because the mother's visitations were sparse and "[t]here was no other family visitation at all. We thought there was going to be some family come through around April-May, and then we didn't hear anything else again until August." Based on their perception that no family was coming forward, they determined that "if we were going to keep going, we might as well adopt."

The foster mother admitted that she had been recently supportive of her friends adopting the twins. She also acknowledged that she told a DFACS case worker in October 2010 that she "did not like the relatives, that she did not want the [female twin] to be molested, put out on the street and get pregnant."[5]

---

[5] In her psychiatric evaluation, the mother reported that she had been molested beginning at age seven by a brother who was three years older. (The uncle who is willing to raise the twins is 23 years older than the mother and is not the brother who allegedly molested the twins' mother. ) The mother also reported that as a teen she skipped a lot of school and "hung around with a negative crowd." She went through

The foster mother testified that the twins call her and her husband "momma" and "dadda." She explained that when the twins "get home from a visit or anything, they just - - they're so happy to see and call us momma and pat us on the face, and a lot of times they'll just say, Are we home, and just - - you know, it's just - - you can feel the attachment and love they have for us." She also testified that the twins "are as nutty about [her three children, ages 21, 18, and 16] as they are us. . . . [the male twin] talks about his Bobby all the time, which is my son, . . . and my daughter Bagney, as they call her, they Skype on the computer every night, and sing songs and play games, and play peekaboo, and whatever you can do on Skype every evening." She acknowledged that "some bond" existed between the twins and their older brother, but she did not believe "it's any more of a bond than they have with any kid at the day care center."

The mother's brother who sought custody testified that he and his wife have been married for 26 years and raised four children. Three of them were in college, including one at the United States Air Force Academy, while his oldest one is

periods of running away and also being asked to leave her home. She gave birth to her first child, Ja. C. W., at the age of 18 and claimed she was "kicked out of her mother's home" when her pregnancy with Ja. C. W. was discovered. The foster mother admitted that she saw "some of the records in this case," although she also acknowledged that DFACS generally provided her with only limited information.

8

married. The uncle works as a high school custodian and his wife works as head secretary at an elementary school.

The uncle testified that he was notified that the children were in DFACS custody in April of 2010. Although he testified that he was "very close" with the mother and knew was "what was going on," he also explained that "no one really disclosed her personal business." He explained that he and his wife "were always there for [the mother] when she needed [them]," but explained that he was "not going to really go around trying to play hero to her family unless she asked me to." When he and his wife were asked to "step in," they "took it to God, and . . . chose to do it." This occurred during a family meeting in April 2010 in which it was determined that he and his wife were best suited to take in the children. The home evaluation conducted by DFACS was completed in October 2010; the uncle did not know why it took six months to complete.

While he knew the twins' age, he did not know their middle names or birthday, but explained that his love "can overshadow a lot." He stated that his wife knew the twins' birth dates and that he would study this information and ensure that no "hurt, harm or danger" came to them. He was "ready, willing, and able to provide a home" for the twins, was willing to raise all three children, and had already obtained custody

of the older brother. In his opinion, the twins were bonded with their older brother. Finally, he testified that he understood that if he and his wife were given custody of the twins, they would be responsible for raising them and "could not give the children to [the mother] simply because [he] thought [she] got her act together."

At the conclusion of the hearing, DFACS asked the court to grant its motion to modify custody to the aunt and uncle because they stepped forward after the mother identified them, and could provide a good home and raise all three children together. The children's attorney asserted that the older sibling should remain with the aunt and uncle, but the twins should remain with the foster parents. He reasoned that the children had already "been split up for twenty months" and that it was too late to "forge a connection that isn't there anymore."

> After hearing testimony from the foster mother and the maternal uncle on issues of custody only, the juvenile judge ruled from the bench and denied DFACS' motion to modify custody of the twins to the aunt and uncle and granted custody of the twins to the foster parents over the objection of the mother and DFACS.[6] It entered a written order to this effect on January 19, 2011 at 3:01 p.m., which also relieved DFACS of custody over the twins. The associate judge hearing the motions on

---

[6] "The juvenile judge ordered that the twins' older brother be placed with the aunt and uncle." *J. C. W. II*, 315 Ga. App. at 569, n. 4.

10

custody and nonreunification at no time issued a ruling on DFACS' pending petition to terminate the parental rights, and evidence was not submitted on this issue.

In a written order entered the same day at 3:02 p.m., the judge found that "[t]he mother, through counsel, consented to the Motion [for nonreunification]. Based on the consent of mother through counsel, the [c]ourt finds that [the mother] of the … children, has failed to achieve the goals in the case plan designed to enable her to be reunited with her children." After a recitation of facts concerning the mother's fitness and conduct stated in the motion, for which no evidence was introduced in the hearing, the juvenile judge concluded that parental misconduct existed within the meaning of OCGA § 15-11-94 (b) (4) (A) (i)-(iv). It then concluded, that "non-reunification of these children with their parents is in their best interest. Therefore, reunification efforts by the Department shall cease, in accordance with OCGA § 15-11-58 (h). *Custody of the children remains with [DFACS].*"[7]

On January 13, 2011, the mother moved for rehearing under OCGA § 15-11-21 (e). The chief juvenile court judge granted the motion for rehearing on February 1, 2011.[8] On February 28, 2011, the chief juvenile

---

[7] "This finding regarding DFACS' custody contradicts the order entered one minute before that granted custody to the foster parents. The previous order stated that DFACS 'is relieved of any further custodial responsibilities towards the children.'" *J. C. W. II*, 315 Ga. App. at 570, n. 5.

[8] On February 22, 2011, DFACS moved to dismiss as moot its pending petition for termination of parental rights based upon the juvenile court's November 18, 2010

11

judge issued an 11-page order in which she conducted a de novo review under Uniform Juvenile Court Rule 19.2. . . . Based on [its] findings, the chief juvenile judge vacated the associate juvenile judge's January 19, 2011 order and awarded custody to the aunt and uncle under OCGA § 15-11-58 (i) until the twins' eighteenth birthdays.

*In the Interest of J . C. W.*, 315 Ga. App. 566 (727 SE2d 127) (2012) (*J. C. W. II*), cert. denied. (*J. C. W. II*).

In *In the Interest of J. C. W.*, 311 Ga. App. 894 (717 SE2d 512) (2011) (*J. C. W. I*), we vacated the chief juvenile judge's February 28, 2011 order based upon her failure to make a finding that "referral for termination of parental rights and adoption was not in the twins' best interest." Id. at 894. See OCGA § 15-11-58 (i). After the case was remanded, the chief juvenile judge issued an order on October 21, 2011 that is the subject of the current appeal. In its order, the rehearing court: vacated the order granting custody to the foster parents; granted the motion for nonreunification; found that the permanency plan was "placement with a fit and willing relative;" found that

order transferring custody of the twins from DFACS to the foster parents. On March 4, 2011, the juvenile judge to whom the case had been assigned, not the chief judge before whom the rehearing motion was pending, granted DFACS' motion to dismiss the petition for termination of parental rights and ordered that it "be dismissed as moot." We note that at the time of our decision in *J. C. W. II,* supra, the record before us did not include a copy of this order.

12

termination of parental rights and adoption was not in the best interest of the children pursuant to OCGA § 15-11-58 (i) (1); granted the motion to modify custody to the aunt and uncle; and denied the foster parents' motion to intervene and to be recognized as parties.

*Superior Court Proceedings*

On December 15, 2010, following the oral grant of their request for custody [on November 18, 2010], the foster parents filed a petition for adoption in Fulton County Superior Court that also sought termination of the mother's parental rights.[9] This petition was not served on DFACS or the aunt and uncle, and the foster parents did not obtain consent for the adoption from DFACS before filing it. See OCGA §§ 19-8-3 (b) and 19-8-13 (a) (2); *Owen v. Watts*, 303 Ga. App. 867, 869 (2) (695 SE2d 62) (2010).

On March 9, 2011, the foster parents sought termination of parental rights through a summary judgment motion relying upon certified copies of petitions and orders filed in the juvenile court.[10] The superior court held a hearing on March 11, 2011, and issued orders the same day

---

[9] "It appears this case was not assigned to a Family Division judge as required by Fulton County Superior Court Family Division Case Management Rules 100-2, 100-3, and 400-1." *J. C. W. II*, supra, 315 Ga. App. at 571 n. 7.

[10] "The certified copies of the juvenile court records were provided to the foster parents' counsel by the child advocate attorney who represented the children in juvenile court." *J. C. W. II*, supra, 315 Ga. App. at 571, n. 8.

13

terminating parental rights and granting the foster parents' petition for adoption of the twins. The order terminating parental rights was based upon the facts contained in the certified juvenile court records, not evidence submitted during the hearing. The juvenile court records reviewed by the superior court did not include any DFACS internal records, such as case plans or reports of any psychiatric assessments of the mother.

*J. C. W. II*, supra, 315 Ga. App. at 571.

The mother appealed to this court, and this court concluded that "the superior court erred by exercising jurisdiction over the issue of termination" because a termination petition was first filed in juvenile court. Id. at 572 (1). We therefore vacated the superior court's judgment.

1. We first address the mother's contention that the twins lack standing to appeal in the absence of an appointed guardian ad litem. In *In the Interest of W. L. H.*, 314 Ga. App. 185 (723 SE2d 478) (2012), cert. granted, Ga. (Case No. S12G1049, May 29, 2012), we held that a child could not file an appeal from a deprivation order through a court-appointed attorney acting as the child's counsel. Id. at 186-187. We reasoned that a child cannot "appeal without the aid of a guardian or next friend." Id. at 187. The facts presented in *W. L. H.*, however, differ from those presented here. In

14

*W. L. H.*, the child had both a guardian ad litem and an attorney, and the guardian ad litem filed a brief opposing the child's appeal brought by his attorney. Id. at 186.

In this case, it is undisputed that the children do not have a court-appointed guardian and that they were represented below by the Fulton County Office of Child Attorney, which filed this appeal on their behalf. Our holding in *W. L. H.* is therefore factually distinguishable because there is no conflict between a guardian ad litem and an attorney regarding whether an appeal should be pursued on the children's behalf. Additionally, while we noted in *W. L. H.*, supra, that we could "find no authority for an unemancipated minor in a deprivation action, even if represented by counsel, to appeal without the aid of a guardian or next friend," we did not so hold. Id. at 187.

Now that the issue is squarely before us, we are reluctant to conclude that the children in this case lack standing to appeal through their attorney. It cannot be questioned that the children are real parties in interest whose lives will be directly affected by the juvenile court's decision regarding custody until their 18th birthday under OCGA § 15-11-58 (i) (1). Cf. *Kesterson v. Jarrett*, 291 Ga. 380, 392 (2) (f) (728 SE2d 557) (2012) (noting that while children may not be sui juris as a matter of law, they are still real parties in interest with a right to be present in a civil action). While the children do not have a guardian available to contest the juvenile court's

15

ruling on their behalf, they do have an attorney who has advocated on their behalf in juvenile court and now seeks to do the same on appeal. Dismissing the children's appeal under these particular facts and circumstances would be a miscarriage of justice. We therefore deny the mother's request to dismiss this case based upon the children's lack of standing, and we find that the children's attorney may bring this appeal on their behalf as there is no other representative available to do so.[11] We emphasize that this holding is limited to the particular facts and circumstances of this case.

2. In related enumerations of error, the children contend that the rehearing court lacked jurisdiction to issue its October 21, 2011 rehearing order because DFACS filed a motion to dismiss its termination petition as moot on February 22, 2011, a different juvenile judge granted DFACS' motion to dismiss its petition to terminate as moot on March 4, 2011,[12] and the superior court terminated parental rights and granted an

---

[11] While we recognize that the Civil Practice Act does not apply in Juvenile Court, see Div. 2, infra, we note that OCGA § 9-11-17 (c) allows a court to "appoint a guardian ad litem for an infant or incompetent person not otherwise represented in an action or shall make such other order as it deems proper for the protection of the infant or incompetent person."

[12] We note that this motion was granted only after the rehearing court entered its order on February 28, 2011 awarding custody of the twins to the aunt and uncle.

16

adoption on March 11, 2011. According to the children, DFACS' motion to dismiss the termination petition as moot should be equated with a voluntary dismissal without prejudice of a complaint filed under the Civil Practice Act, OCGA § 9-11-41 (a); this dismissal therefore divested the juvenile court of jurisdiction of the termination of parental rights; and the December 15, 2010 termination petition filed in superior court in connection with the foster parents' adoption petition was the only termination action pending at the time the superior court ruled on March 11, 2011.

We disagree. First, DFACS' motion to dismiss as moot should not be equated with a voluntary dismissal by a plaintiff under OCGA § 9-11-41 (a). As pointed out by the children in a supplemental brief, the Civil Practice Act does not apply in Juvenile Court. See *Coleman v. Coleman*, 238 Ga. 183 (232 SE2d 57) (1977); *In the Interest of T. M. M. L.*, 313 Ga. App. 638, 639 (722 SE2d 386) (2012). Second, we have already determined in *J. C. W. II*, supra, that the superior court lacked jurisdiction to terminate parental rights because a petition to terminate parental rights was first filed in juvenile court. 315 Ga. App. at 571-572 (2). And, the March 4, 2011 order dismissing the termination petition *as moot* did not deprive the juvenile court of jurisdiction to enter an order under OCGA § 15-11-58 (i) (1) on either February 28, 2011 or October 21, 2011. Because the termination petition was first filed in

17

juvenile court and the juvenile court determined that a referral for termination of parental rights and adoption was not in the best interest of the children, the superior court could not exercise its concurrent jurisdiction to terminate parental rights.[13] The option of termination of parental rights was properly before the juvenile court *first*; its decision against pursuing this option in favor of nonreunification and an award of custody to the aunt and uncle under OCGA § 15-11-58 (i) (1) cannot later be second-guessed by a different judge in superior court in a later-filed action seeking termination of parental rights and adoption.[14]

---

[13] The Supreme Court of Georgia's recent opinion in *Ertter v. Dunbar, Ga.* Case No. S12G0452, decided November 19, 2012) does not alter this result. In that case, the superior court was the only court with jurisdiction to award permanent custody. The Supreme Court therefore concluded that the principle of priority jurisdiction between two courts with concurrent jurisdiction did not apply. Slip op. at 6.

[14] In support of this enumeration, the children rely upon the three cases already distinguished by this court in *J. C. W. II*, supra, 315 Ga. App. at 572 n. 9. And the fourth decision cited by the children, *Long v. Long*, 303 Ga. App. 215 (692 SE2d 811) (2010), supports our decision in *J. C. W. II* and this case. In *Long*, we concluded that a superior court could not exercise its concurrent jurisdiction to interfere with a juvenile court's decision to award temporary custody to a mother in a deprivation case. Id. at 217-220 (2).

3. The children assert the juvenile court's order must be vacated because the rehearing court erroneously held that the Juvenile Code establishes a preference for relative placement. We agree.

In its order granting custody to the aunt and uncle, the rehearing court wrote:

This Court especially cannot overlook these available and qualified relatives pursuant to OCGA § 15-11-58 (i) (1) after finding that termination of parental rights and adoption is not in the best interests of the children because these relatives are interested in obtaining custody and explicitly must be looked to first pursuant to statutory construction.

It is this Court's belief that the order in which [OCGA § 15-11-58 (i) (1)] is written dictates a clear preference to first look to relatives for placement before a non-relative individual, which is why the Department is required to perform and submit a diligent search for relatives at the disposition of a deprivation hearing pursuant to OCGA § 15-11-55 (a) (2) (B).

Based upon our review of the relevant portions of the Juvenile Code, we do not find a statutory preference in favor of relatives in OCGA § 15-11-58 (i) (1). This Code section provides:

If the court has entered an order finding that reasonable efforts to reunify a child with his or her family would be detrimental to the child . . . and if the court finds that referral for termination of parental rights

19

and adoption is not in the best interest of the child, the court may, upon proper petition, enter a custody order which shall remain in effect until the child's eighteenth birthday:

(A) Placing the child in the custody of a relative of the child if such a person is willing and, after study by the probation officer or other person or agency designated by the court, is found by the court to be qualified to receive and care for the child;

(B) Placing the child in the custody of any nonrelative individual who, after study by the probation officer or other person or agency designated by the court, is found by the court to be qualified to receive and care for the child;

(C) Placing the child in the custody of a suitable individual custodian in another state pursuant to the provisions of Code Section 15-11-89; *or*

(D) In the case where the court has found a compelling reason that a placement pursuant to subparagraph (A), (B), or (C) of this paragraph is not in the child's best interest, placing the child in the custody of an agency or organization licensed or otherwise authorized by law to receive and provide care for the child which is operated in a manner that provides such care, guidance, and control as would be provided in a family home as defined in the court's order.

> Such order may be modified following a petition for modification by a party or upon motion of the court pursuant to Code Section 15-11-40.

(Emphasis supplied.) While this statute lists the custody options available to a juvenile judge under OCGA § 15-11-58 (i) (1) in a certain order, this list should not be construed as one expressing a legislative intent for *priority* of placement. "The natural meaning of 'or,' where used as a connective, is to 'mark an alternative and present choice, implying an election to do one of two things." (Citation and punctuation omitted.) *Gearinger v. Lee*, 266 Ga. 167, 169 (2) (465 SE2d 440) (1996). And, where the Legislature has intended a preference for relative placement, it has previously made its intention clear. Before July 1, 2010, former OCGA § 15-11-103 (a) required the juvenile court to "*first* attempt to place the child with a person related to the child by blood or marriage" following a termination of parental rights. (Emphasis supplied.) Indeed, in OCGA § 15-11-58 (i) (1) itself, the Legislature expressly mandated a form of placement priority in subsection (i) (1) (d) by permitting a juvenile court to use the placement outlined in this subsection only as a last resort if the other three alternative placements would not be in the child's best interest.

Because OCGA § 15-11-58 (i) (1) contains no preference in favor of relative placement, the juvenile court erred by finding otherwise. Because we cannot determine whether this erroneous legal conclusion affected the rehearing court's exercise of its discretion with regard to whether a referral for termination and adoption was in the best interest of the children, as well as its decision to award custody to the aunt and uncle, we must vacate its order granting custody.[15]

4. The children contend that the rehearing court also erred by failing to conduct a de novo review of the evidence presented to the associate juvenile judge. We disagree. While the rehearing court made some rulings that were "appellate" in nature, it is clear from a review of the entire order that the rehearing court conducted a de novo review of the issues before the associate juvenile judge and made its own findings. See OCGA § 15-11-21 (e); Uniform Juvenile Court Rule 19.2. Our opinion in *In the Interest of M. E. T.*, 197 Ga. App. 255, 256-257 (1) (398 SE2d 30) (1990), does not require a different result because in that case, the rehearing court did not conduct a de novo review resulting in its own findings, but instead issued an order denying the "appeal" and confirming the findings of the associate judge.

---

[15] This holding addresses the error claimed by the children in Enumeration VII and VIII.

22

Although we do not find any merit in this enumeration of error, based upon our decision to vacate the order on other grounds, we take this opportunity to instruct the rehearing court, out of an abundance of caution, to remove any findings in the nature of appellate rulings from its order.

5. The children argue that the rehearing court "erroneously found the existence of a conditional stipulation agreement as to nonreunification and placement." In support of their argument, the children point to the following portions of the October 21, 2011 order:

> The mother stipulated to both the Motion for Non-Reunification and the Petition to Modify Custody as there was an agreement between the mother and the Department of Family and Children Services that the stipulation would allow her children to be placed with her brother and sister-in-law. . . .

> By failing to adopt the permanency plan of the motion for non-reunification, the court failed to give the proper consideration to the agreement reached between the mother and the Department wherein the permanency plan was changed to placement with a fit and willing relative. The court further ignored the principle of detrimental reliance in that the mother agreed to the motion for non-reunification and waived service so the hearing would proceed with the express understanding that all of her children would be placed with her relatives under the petition to modify custody. . . . Under this arrangement, the mother

23

would not have been precluded from returning to court to seek custody of her children at some point in the future. When the court placed the twins with the foster parents, the mother did not get the benefit of her bargain and now risks losing the children forever as the foster parents wish to adopt.

The children argue that this language shows that the rehearing court erred by finding that a conditional "agreement existed and that the . . . [m]other deserved the benefit of this unexpressed and nonexistent bargain."

A review of the remainder of the order, however, fails to demonstrate that the rehearing court relied upon this alleged bargain when deciding to award custody of the twins to the aunt and uncle. Nor does it show that the rehearing court acted under an assumption that it was obligated to accept the custody arrangement proposed by DFACS and the mother. Instead, the rehearing court reviewed the facts before it de novo and made its own independent analysis of the best interest of the children with regard to custody. While we find no error, we note that the language relied upon by the children appears to be "appellate" in nature and should be removed following remand in accord with Division 4 of this opinion.

6. The children assert that the rehearing court lacked jurisdiction to conclude in its October 24, 2011 order that termination of parental rights and adoption was not

in the best interest of the children. Instead, according to the children, the juvenile court should have limited its findings to whether "*referral for* termination and adoption was in the twins' best interests" under OCGA § 15-11-58 (i) (1). To the extent the children contend the juvenile court lacked subject matter jurisdiction to consider the issue of termination, we disagree. See OCGA § 15-11-28 (a) (2) (C) (juvenile court jurisdiction over termination of parental rights). With regard to the children's argument that the rehearing court erred by considering the issue of whether termination of parental rights was in the best interest of the children, we conclude from an examination of the rehearing court's order as a whole that it was analyzing the "referral for" issue following this court's remand in *J. C. W. I*, supra, and simply failed to include the words "referral for" in each instance that it discussed this issue. Because we have already determined that a remand is warranted, however, we again instruct the rehearing court, out of an abundance of caution, to clarify that in each instance it discusses whether termination and adoption is in the best interest of the children, it is doing so in the context of whether a "referral" under OCGA § 15-11-58 (i) (1) would be in the best interest of the children.

7. The children assert that the rehearing court erred by ruling the foster mother's testimony inadmissible. We disagree. After carefully reviewing the October 21, 2011 order, we do not find such a ruling. Instead, the rehearing court concluded:

> The [associate judge] was further in error when it proceeded to hear evidence regarding the foster parents on the Petition to Modify Custody. The only Petition to Modify Custody at the time of the hearing that was properly before the court was the one filed by the Department on November 16, 2010 placing the children with the uncle and aunt. The Child Attorney failed file a Petition to Modify Custody with the court asking for custody to be modified to the foster parents as required pursuant to a finding that termination of parental rights and adoption was not in the best interests of the children under . . . OCGA § 15-11-58 (i) (1) . . . Since the Child Attorney failed to file a Petition to Modify with the court, the court was in error to allow the Child Attorney to proceed with an argument. . . . As such, neither the Department nor the mother had notice of any Petition to Modify Custody to the foster parents which should have been provided pursuant to OCGA § 15-11-55.1 . . . Further, at the time the court granted the Motion for Non-Reunification, it adopted the permanency plan which was placement of all of the children with the maternal uncle and aunt. Therefore, the Petition to Modify Custody that followed should have been in respect to modify custody only to the maternal uncle and aunt in adhering to the permanency plan and statutory requirement that a petition to modify custody be filed before the court.

Based on the above, it is clear that the rehearing court merely concluded that a proper petition to modify custody to the foster parents was not before it; in essence, it concluded that the issue before it was whether it was in the best interest of the children for custody to be awarded to the aunt and uncle, and that the available options did not include the grant of an untimely motion to modify custody to the foster parents. The children have not asserted that this ruling was error.[16] The only error that they do assert - - that the rehearing court ruled that the foster mother's testimony was inadmissible - - is not supported by the record.

8. In their remaining enumeration of error, the children contend that the rehearing court erred by entering its October 21, 2011 order nunc pro tunc to February 28, 2011, the date of its first rehearing order.

> The purpose of entering an order nunc pro tunc is to *record some previously unrecorded action actually taken or judgment actually rendered*. It may not be used to supply an order not yet made by the court. A nunc pro tunc entry is an entry made now of something actually previously done to have effect of former date; not to supply omitted action, but to supply omission in the record of action really had but omitted through inadvertence or mistake.

---

[16] We note that at no time have the foster parents attempted to appeal from the rehearing court's conclusion that they were not entitled to intervene in the juvenile court action or that a motion to modify custody to them was untimely.

(Citations and punctuation omitted; emphasis in original.) *In the Interest of D. C. H.*, 300 Ga. App. 827, 828 (1) (686 SE2d 434) (2009). "The general rule is that nunc pro tunc entries are proper to correct clerical errors but not judicial errors." (Citation and footnote omitted.) *In the Interest of H. L. W.*, 244 Ga. App. 498, 499 (535 SE2d 834) (2000).

In this case, the October 21, 2011 order did more than correct a clerical error; instead, it supplied legal reasoning and analysis absent from the first order. Id. The rehearing court therefore erred by including a nunc pro tunc entry; the effective date of the order is therefore October 21, 2011, not February 28, 2011.

9. In conclusion, we vacate the rehearing court's October 21, 2011 order based upon an erroneous legal conclusion that OCGA § 15-11-58 (i) (1) includes a preference for relative placement and remand for proceedings not inconsistent with this opinion. We encourage the chief juvenile judge to act expeditiously following receipt of the remittitur and order the clerk of the juvenile court to transmit the record to this court no more than 30 days following entry of any notice of appeal.

*Judgment vacated and case remanded with direction. Doyle, P. J. and Andrews, J., concur.*

28